# EXHIBIT B



Not Reported in F.Supp.  
Not Reported in F.Supp., 1990 WL 171772 (N.D.Ill.)  
**(Cite as: Not Reported in F.Supp., 1990 WL 171772)**

Page 1

**H**Marzec v. Village of Crestwood
N.D.Ill.,1990.
Only the Westlaw citation is currently available.
 United States District Court, N.D. Illinois, Eastern Division.
Ronald M. **MARZEC**, Ronald M. **Marzec**, Jr., David V. Kaczmarek and Jeffrey A. Grenier, Plaintiffs,
v.
VILLAGE OF CRESTWOOD, Bee Lee Towing Co., Ronald Aumueller d/b/a American Leasing Company of Palos Hills, Defendants.
No. 88 C 8771.

Oct. 30, 1990.

MEMORANDUM OPINION AND ORDER

LINDBERG, District Judge.
*1 Plaintiffs, Ronald M. **Marzec**, Ronald M. **Marzec**, Jr., David V. Kaczmarek, and Jeffrey A. Grenier, have filed a motion for summary judgment as to liability. Each of the defendants, the Village of Crestwood, Bee Line Towing Co., and Ronald Aumueller, has filed a motion for summary judgment as well. Plaintiffs' motion for summary judgment is denied and defendants' motions for summary judgment are granted.

Summary judgment should be rendered:

[I]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

FRCP 56(c). As the 7th Circuit has said:

Summary judgment is appropriate where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).... The summary judgment standard "mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict." [Anderson v. Liberty Lobby Inc., 477 US 242, ----, 106 S Ct 2505, 2511, 91 L Ed 2d 202, ---- (1986) ].

Teamsters Local 282 Pension Trust Fund v. Angelos, 839 F2d 366, 369-70 (7th Cir 1988).

Plaintiffs brought this action alleging that the defendants violated their civil rights. 42 USCA § 1983 (West 1981). Specifically, plaintiffs allege in their Second Amended Complaint:

7. That Aumueller is the owner of certain premises ... ("property") ...

8. That Aumueller entered into a lease with **Marzec** for the property expiring on October 31, 1990, which lease continues in full force and effect.

9. No action in any court has been taken to dispossess **Marzec** of his right to possession of the property as lessee.

10. That **Marzec**, **Marzec**, Jr., Kaczmarek and Grenier [plaintiffs] operate the business of C & R Auto and Truck Repair on the property with the permission of **Marzec** [sic].

11. That [plaintiffs] in the operation of their business are given possession of customer motor vehicles for purposes of repair and become the bailee of those motor vehicles.

13. That Aumueller ... authorized the Village to tow certain motor vehicles owned by the plaintiffs or customers of the plaintiffs from the property without the authorization of or notice to the owners or bailees of those motor vehicles, without resort to any statutory procedure of the Illinois Vehicle Code or without any court order.

14. That on or about September 20, 1988, the Village

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1990 WL 171772 (N.D.Ill.)
(Cite as: Not Reported in F.Supp., 1990 WL 171772)

Page 2

directed Bee Line to Tow various motor vehicles from the property knowing that there were no signs or notices posted on the property complying with the provisions of Section 4-203 and Section 18a-302 of the Illinois Vehicle Code, knowing that the towing was not authorized under the Illinois Vehicle Code, knowing that no authorization of or notice to the owners or bailees of those motor vehicles had been given or obtained, and knowing that the Aumueller [sic] did not have any court order directing the towing of the motor vehicles or dispossessing **Marzec** of any right in the property.

**\*2** 15. That the actions of Aumueller and Bee Line, in cooperation with the Village, in towing of the motor vehicles without complying with the Illinois Vehicle Code, and evicting the plaintiffs without a court order, but with assistance from the police department of the Village, constitute action by Aumueller and Bee Line under color of law.

16. That the Village did not give any pre-tow notice concerning the motor vehicles.

17. That the Village did not give any post-tow notice that the vehicles were towed and has not provided any post-tow hearing.

20. That Aumueller, after having the motor vehicles and [sic] impounded by the Village and Bee Line, has locked the plaintiffs out of the property, and has taken unauthorized control and possession of various tools and implements of trade owned by the plaintiffs. The plaintiffs are informed and believe that Aumueller has either destroyed or sold the tools and implements of trade.

21. That [plaintiffs] are unable to operate the business of C & R Auto and Truck Repair because of the actions of the Village, Bee Line, and Aumueller who have acted jointly to have the motor vehicles towed and have helped to dispossess **Marzec** of the property.

22. That the actions of Aumueller, the Village and Bee Line in towing the vehicles, without notice, without hearing; impounding the vehicles until payment of charges, without hearing; and dispossessing the plaintiff of their property rights are unconstitutional and illegal for the reason that they deprive plaintiffs of property without due process of law in contravention of the Fifth and Fourteenth Amendments of the United States Constitution.

It is significant that, under this complaint and the arguments made on the motions for summary judgment, the only way in which Aumueller and Bee Line could have acted under color of law was, in the words of plaintiffs' memorandum in support of their motion for summary judgment, if they "became willful participants in joint activity with the Village." See _Dennis v. Sparks,_ 449 US 24, 27, 101 S Ct 183, 186, 66 L Ed 2d 185, ---- (1980). While under proper circumstances private individuals may be liable under Section 1983 if they are willful participants in joint activity with the agents of a municipality, see Erwin S. Chemerinsky, _Federal Jurisdiction_ § 8.3 at 383 (Little, Brown and Company 1989), _Dennis v. Sparks,_ 449 US 24, 27, 101 S Ct 183, 186, 66 L Ed 2d 185, ---- (1980), the complaint in the case at bar, liberally construed, alleges at most that Aumueller and Bee Line were willful participants in joint activity with the Village itself, not with the Village's agents. Therefore, if the Village did not perform the acts of which plaintiffs complain, plaintiffs cannot recover from Aumueller or Bee Line.

There are basically two separate aspects to plaintiffs' claim. Plaintiffs claim that their rights were violated (1) by the towing of the vehicles and (2) by Aumueller locking them out of the property and taking control of their tools and implements of trade. The dispositive question with respect to each aspect of plaintiff's claim is whether the Village violated plaintiffs' rights.

**\*3** The United States Supreme Court has stated:

Local governing bodies ... can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where ... the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers. Moreover, although the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other § 1983 "person," by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental "custom" even though such custom has

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:08-cv-01147   Document 18-3   Filed 04/28/2008   Page 4 of 8

Not Reported in F.Supp.                                                                                           Page 3
Not Reported in F.Supp., 1990 WL 171772 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1990 WL 171772)**

not received formal approval through the body's official decisionmaking channels....

On the other hand, ... Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort. In particular, we conclude that a municipality cannot be held liable *solely* because it employs a tortfeasor-or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory.

zl

We conclude, therefore, that a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

*Monell v Department of Social Services of the City of New York,* 436 US 658, 691-95, 98 S Ct 2018, 2035-38, 56 L Ed 2d 611, ---- - -- (1978). Subsequent to *Monell,* the Court has further explained:

The "official policy" requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible. *Monell* reasoned that recovery from a municipality is limited to acts that are, properly speaking, acts "of the municipality"-that is, acts which the municipality has officially sanctioned or ordered.

With this understanding, it is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances. No one has ever doubted, for instance, that a municipality may be liable under § 1983 for a single decision by its properly constituted legislative body-whether or not that body had taken similar action in the past or intended to do so in the future-because even a single decision by such a body unquestionably constitutes an act of official government policy.... But the power to establish policy is no more the exclusive province of the legislature at the local level than at the state or national level. *Monell's* language makes clear that it expressly envisioned other officials "whose acts or edicts may fairly be said to represent official policy,"*Monell, supra,* 436 U.S., at 694, 98 S.Ct., at 2037-2038, and whose decisions therefore may give rise to municipal liability under § 1983.

*4 ... To be sure, "official policy" often refers to formal rules or understandings-often but not always committed to writing-that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time.... However, ... a government frequently chooses a course of action tailored to a particular situation and not intended to control decisions in later situations. If the decision to adopt that particular course of action is properly made by that government's authorized decisionmakers, it surely represents an act of official government "policy" as that term is commonly understood. More importantly, where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly. To deny compensation to the victim would therefore be contrary to the fundamental purpose of § 1983.

*Pembaur v City of Cincinnati,* 475 US 469, 480-82, 106 S Ct 1292, 1298-99, 89 L Ed 2d 452, ---- - -- (1986). Whether a particular official has final policymaking authority is a question of state law. See *City of St. Louis v. Praprotnik,* 485 US 112, ----, 108 S Ct 915, 924, 99 L Ed 2d 107, ---- (1988) (opinion of J. O'Connor joined in by C.J. Rehnquist, J. White, and J. Scalia); *Pembaur v City of Cincinnati,* 475 US 469, 483, 106 S Ct 1292, 1300, 89 L Ed 2d 452, ---- (1986) (opinion of J. Brennan joined in by J. White, J. Marshall, and J. Blackmun). Also, a challenged action must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy in that area of the municipality's business. *City of St. Louis v Praprotnik,* 485 US 112, ----, 108 S Ct 915, 924, 99 L Ed 2d 107, ---- (1988) (opinion of J. O'Connor joined in by C.J. Rehnquist, J. White, and J. Scalia); *Pembaur v City of Cincinnati,* 475 US 469, 482-83, and n 12, 106 S Ct 1292, 1299-1300, and n 12, 89 L Ed 2d 452, ----, and n __ (1986) (opinion of J. Brennan joined in by J. White, J. Marshall, and J. Blackmun).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 4
Not Reported in F.Supp., 1990 WL 171772 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1990 WL 171772)**

The Seventh Circuit, in the context of a related but somewhat different issue, has recently discussed the question of what actions are to be considered policy. The court said:

[T]he acts of a state employee may be attributable to the state.... The issue is whether a single act of employee misconduct, which clearly contravenes established state policy and procedure as contained within formal rules, regulations, and statutes, automatically becomes the state's new position in all similar matters or whether the act, when viewed from the state's perspective, is merely a "random and unauthorized" deviation.

Without a doubt, the employee's position in the governmental hierarchy is relevant to this inquiry. For example, consider a variety of situations in which a state's policy and procedures in a given area are delegated to a specified policymaker, be it a single person, a committee, or the state legislature. If the policymaker establishes policy and procedure on an informal basis without the aid of formal policy and procedure guidelines-that is, decides policy on a case-by-case basis-then his pronouncement in a given case reflects the state's position. Thus, a party who suffers a loss without due process protection in his individual case may easily argue that the loss occurred as a result of an inadequate established procedure.

*5 In another scenario, consider a policymaker or series of policymakers who establish policy and procedure through a deliberative, or even legislative, process which culminates in a certain concrete position expressed in a formal pronouncement. In such a situation, it is reasonable to believe that only the results of that more formal process reflect the state's established policy and procedure. If the policymaker's subordinate, or even the policymaker himself, deviates in a single instance from the more formal pronouncement, it is less likely to reflect a new trend in state policy and procedure. A shift in policy is only likely to occur in one of two situations. First, a shift occurs if the same formal steps which created the original policies and procedures are repeated and culminate in the pronouncement of new policy and procedures. Second, a state's position may change if the policymaker repeatedly deviates from the formally established policy and procedure until his practice and custom has replaced the formal policy and procedures.

Because the state promulgated policy and procedure by formal means, the employment status of the state employee violating that procedure must be considered much less important in determining whether a deviation from the policy may be characterized as random and unauthorized under Parratt. Even if we assume that the appellants qualify as "policymakers" themselves-which we doubt given their position in the governmental hierarchy-their "policy". which at absolute best may be characterized as informal, cannot be said automatically to preempt or displace otherwise adequate existing state policy and procedure. Because the state through its designated policymaking branches created its formal policies and procedures, we cannot entertain a claim that the single act of a state employee now reflects the state's established policies and procedures.

*Easter House v Felder*, 910 F2d 1387, 1402-03 (7th Cir 1990).

According to plaintiff, the automobiles were towed by Bee Line on orders of the Village's Chief of Police, at the request of Aumueller. With respect to the automobiles, the Village had an ordinance that provided in pertinent part:

10-9-1: DEFINITIONS: For the purpose of this ordinance, the following words shall have the meanings ascribed to them as follows:

"Abandoned Vehicle" means all motor vehicles or other vehicles in a state of disrepair rendering the vehicle incapable of being driven in its condition; or any motor vehicle or other vehicle that has not been moved or used for 7 consecutive days or more and is apparently deserted.

10-9-2 ABANDONMENT:.... The abandonment of a motor vehicle or other vehicle or any part thereof on private ... property, other than a highway, in view of the general public, anywhere in this Village is unlawful except on property of the owner or bailee of such abandoned vehicle. A motor vehicle or other vehicle or any part thereof so abandoned on private property may be authorized for removal by or upon the order of the Chief of Police department of the Village, after a waiting period of 7 days or more has expired.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:08-cv-01147   Document 18-3   Filed 04/28/2008   Page 6 of 8

Not Reported in F.Supp.
Not Reported in F.Supp., 1990 WL 171772 (N.D.Ill.)
(Cite as: Not Reported in F.Supp., 1990 WL 171772)

Page 5

*6 10-9-3 TEMPORARY POSSESSION: When an abandoned, lost, stolen or unclaimed motor vehicle or other vehicle comes into the temporary possession or custody of a person in this State, not the owner of the vehicle, such person shall immediately notify the Village Police Department when the vehicle is within the corporate limits of the Village. Upon receipt of such notification, the Chief of the Crestwood Police Department shall authorize a towing service to remove and take possession of the abandoned, lost, stolen or unclaimed motor vehicle or other vehicle. The towing service will safely keep the towed vehicle and its contents, maintain a record of the tow until the vehicle is claimed by the owner or any other person legally entitled to possession thereof, or until it is disposed of as provided in this ordinance.

Under these ordinances, the Village has delegated little, if any, policymaking authority with respect to towing abandoned vehicles to the Chief of police.

If, as has been argued, the provisions of the Municipal Code of the Village of Crestwood § 10-9-2 (Code), controlled the towing at issue, it is undisputed that the Chief of police was acting contrary to the policy of the Village. This is because that provision required a seven day waiting period prior to towing and the Chief did not wait seven days after Aumueller's request that the vehicles be towed. If this section of the Code were applicable then, the Chief's ordering of the towing of the vehicles cannot be attributed to the Village and a Section 1983 action for the acts of the Chief would not lie against the Village. Plaintiffs belatedly argue in a memorandum that, even if the Village did not act, Aumueller and Bee Line can still be held to have acted under color of law by joint action with the Chief. This is a very different claim than that made in the Second Amended Complaint; one which would require different proof and would implicate different defenses from the claim that Aumueller and Bee Line acted jointly with the Village. It is too late in the case for plaintiffs to be making such a substantial change in their claim.

It does not appear, however, that Code Section 10-9-2 is the operative ordinance provision. It is undisputed that Aumueller went to the Village's police, according to plaintiffs to the Chief, to have the vehicles towed. It is also undisputed that, prior to the towing of the vehicles, Aumueller gave the Village Police Department a written document describing the vehicles and stating:

Gentlemen,

The above vehicles are illegally parked on my property. The Tennant [sic] C & R Auto abandoned the premises. The phone is disconnected. The mailbox has been removed. Letters are left on the door have [sic] gone unanswered.

Please have police tow immediately.

Thank you-Owner-Ronald Aumueller

*American Leasing*

The document included phone numbers where Aumueller could be reached. This was sufficient to constitute notification of the Chief that Aumueller had come "into the temporary possession or custody" of several abandoned motor vehicles which he did not own. "Upon receipt of such notification, the Chief of the Crestwood Police Department shall authorize a towing service to remove and take possession of the abandoned, lost, stolen or unclaimed motor vehicle or other vehicle." Thus, Code § 10-9-3 required the Chief to order the towing upon notification, and did not impose upon him any obligation to verify the truthfulness of Aumueller's notification.

*7 In fact, Code § 10-9-3 substantially a duplicates a statute of the State of Illinois. That statute provides:

When an abandoned, lost, stolen or unclaimed vehicle comes into the temporary possession or custody of a person in this State, not the owner of the vehicle, such person shall immediately notify the municipal police when the vehicle is within the corporate limits of any city, village or town having a duly authorized police department, or the State Police or the county sheriff when the vehicle is outside the corporate limits of a city, village or town. Upon receipt of such notification, the municipal police, State Police or county sheriff will authorize a towing service to remove and take possession of the abandoned, lost, stolen or unclaimed vehicle. The towing service will safely keep the towed vehicle and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 6
Not Reported in F.Supp., 1990 WL 171772 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1990 WL 171772)**

its contents, maintain a record of the tow as set forth in Section 4-204 for law enforcement agencies, until the vehicle is claimed by the owner or other person legally entitled to possession thereof or until it is disposed of as provided in this Chapter.

Ill Ann Stat, ch 95 1/2 , § 4-202 (West 1989 Supp). Thus, for the purposes of the subject matter of Code § 10-9-3, neither the Chief nor the Village is the policymaker; the State of Illinois is. See _Graff v Nicholl_, 370 F Supp 974, 979-80 (N D Ill 1974).

It is therefore impossible for the Village to be responsible for any violation of plaintiffs' rights caused by the towing. The policymaker for purposes of towing under the circumstances at bar was the State of Illinois. If plaintiffs' rights were violated by towing conducted in accordance with that policy, the Village is not responsible because it was the State's rather than the Village's policy that caused the harm. If plaintiffs' rights were violated by towing ordered by the Chief contrary to the policy, the Village is not responsible under _Monell_ and its progeny. See _Monell v Department of Social Services of the City of New York_, 436 U.S. 658, 691-95, 98 S Ct 2018, 2035-38, 56 L Ed 2d 611, ---- - -- (1978); _Pembaur v City of Cincinnati_, 475 US 469, 480-82, 106 S Ct 1292, 1298-99, 89 L Ed 2d 452, ---- - -- (1986). For the reasons previously stated, plaintiffs cannot now substantially change their claim, so disposition of the claim regarding towing with respect to the Village also disposes of the claim regarding towing with respect to Aumueller and Bee Line. The court would further note that no argument has been made by plaintiff that the procedure established by the State of Illinois in Ill Ann Stat, ch. 95 1/2 , § 4-202 (West 1990 Supp), and replicated by the Village in Code § 10-9-3, offends due process.

Therefore, there is no genuine issue as to any material fact with respect to the towing of the vehicles, and defendants are entitled to judgment with respect to that portion of plaintiffs' claim as a matter of law. FRCP 56(c).

The second aspect of plaintiffs' claim concerns Aumueller's locking them out of the property and taking control of their tools and implements of trade. With respect to this aspect of their claim, plaintiffs set forth as undisputed the following facts:

*8 30. On September 20, 1988, Aumueller changed the locks for the premises so that the plaintiffs could not enter the same....

31. On September 21, 1988, Aumueller directed two of his employees to remove various tools, equipment, parts, and personal property ("property") of the plaintiffs from the premises and transport them to a garbage company....

32. While the property was being removed plaintiff Jeffrey A. Grenier ("Grenier") went to the premises and was not allowed by Aumueller to enter the premises to retrieve his property....

33. Two police officers of the Village refused to allow Grenier to enter the premises to retrieve his property....

34. Grenier offered to show the police officers the lease for the premises and his business card for the premises....

35. The two police officers told Grenier that if he ever returned they would arrest him for trespassing....

36. Aumueller's employees refused to let **Marzec** enter the premises to retrieve his property.

As the foregoing suggests, plaintiffs make no claim that the Village had any role in locking plaintiffs out of the property and taking control of their tools and implements of trade beyond that of the two police officers. There is no suggestion of any evidence that would show a custom or policy of the Village in regard to such matters, and the two police officers were not even arguably policymakers. Therefore, the Village cannot be liable for this aspect of the claim. There is also no possibility of Bee Line's being liable for this aspect of the case, since there is no indication that Bee Line participated in any action, joint or otherwise, having to do with locking plaintiffs out of the property and taking control of their tools and implements of trade. Finally, as noted previously, plaintiffs cannot recover on their claim against Aumueller unless he participated in joint action with the Village. The undisputed facts establish that it was not any action of the Village that caused the claimed violation of plaintiffs' rights. As explained previously, it is too late for plaintiffs to make the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1990 WL 171772 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1990 WL 171772)**

Page 7

substantial change in their claim that a theory of joint action with the two police officers, rather than the Village, would require. Also, there appears to be a dearth of evidence of joint action with the police officers themselves.

Therefore, there is no genuine issue as to any material fact with respect to the aspect of the claim concerning locking plaintiffs out of the property and taking control of their tools and implements of trade. Defendants are entitled to judgment with respect to that portion of plaintiffs' claim as a matter of law. FRCP 56(c).

ORDERED: Plaintiffs' motion for summary judgment is denied. Defendants' motions for summary judgment are granted. Judgment in favor of defendants and against plaintiffs will be set forth on a separate document as provided in FRCP 58 and entered in the civil docket as provided in FRCP 79(a).

N.D.Ill.,1990.
Marzec v. Village of Crestwood
Not Reported in F.Supp., 1990 WL 171772 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.